```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
RICHARD MICHAEL SCOTT, SR.,                                 :   MEMORANDUM DECISION
                                                            :   AND ORDER
                                Plaintiff,                  :
                                                            :   19-cv-6890 (BMC)
                - against -                                 :
                                                            :
COMMISSIONER OF SOCIAL SECURITY,                            :
                                                            :
                                Defendant.                  :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

1.  Plaintiff seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that he is not disabled as defined by the Social Security Act for the purpose of receiving disability insurance benefits. The ALJ found that plaintiff has severe impairments of seizure disorder (unspecified), bipolar, schizophrenia, asthma, and cervical and lumbar radiculopathy. However, the ALJ also found that notwithstanding these impairments, plaintiff could perform sedentary work with the following limitations: sitting only six hours and standing or walking only two hours in an eight-hour day; no lifting or carrying more than ten pounds; only occasionally climbing, squatting, stooping, kneeling, crouching, and crawling; avoidance of dangerous heights and machinery; no concentrated exposure to fumes and no driving; nothing beyond simple, low stress work involving only occasional decision-making and changes in the work setting.

2.  Plaintiff raises two points of error: (i) the ALJ failed to properly weigh the medical evidence; and (ii) the ALJ's finding as to plaintiff's residual functional capacity is not supported by substantial evidence. Because both of these points are closely related (in effect, they make the same point), I will address them together.

3.      Plaintiff's first argument is that the ALJ did not sufficiently explain why he was giving the opinion of one of plaintiff's treating physicians, Dr. Marina Andrianova, a family practitioner, "little weight." Dr. Andrianova gave an arguably more restrictive opinion of plaintiff's RFC than the ALJ found (although, as shown below, it wasn't all that different). Plaintiff relies on 20 C.F.R. § 404.1527(c), which provides that if an ALJ does not give the opinion of a treating physician controlling weight, he must consider a number of factors in determining how much weight to give it.

4.      The ALJ plainly did not do that. Nor, in concluding that Dr. Andrianova's opinion "is not supported by objective medical evidence" and "is not adequately supported by clinical findings or diagnostic testing," did the ALJ cite to any evidence in the record inconsistent with her opinion, *i.e.*, what evidence in the record, or "clinical findings," or "diagnostic testing" (save one, discussed below) refuted her opinions.

5.      I agree with plaintiff that the ALJ gave short shrift to Dr. Andrianova's opinions and that the ALJ's presentation of his analytical process did not comply with § 404.1527(c). I would have much preferred it (and I suspect that the Commissioner's attorney would have too) if the ALJ had discussed the factors in § 404.1527(c), or at least had been specific about the internal inconsistencies between Dr. Andrianova's opinions and her treatment notes, or between her opinions and other parts of the record. Doing so would have greatly facilitated judicial review. At the same time, however, my experience is that ALJs rarely interpret the word "consider" in the regulation to mean "write about," despite the strong suggestion to that effect in subsection (f)(2). If the word "consider" in subsection (c) is construed as an analytical process explained in writing, as subsection (f)(2) appears to require, subsection (c) is honored more in the breach than in the observance.

6. The failure to adequately present the ALJ's analytical process is what the Second Circuit referred to as a "procedural error" in Estrella v. Berryhill, 925 F.3d 90, 96 (2d Cir. 2019). If the ALJ wasn't going to discuss the subsection (c) factors, he could have at least cited the contrary medical evidence, clinical tests, or diagnostic testing, or pointed out what was missing from Dr. Andrianova's treatment notes, that compelled him to discount her opinion so severely.

7. As Estrella notes, 925 F.3d at 96, the failure to comply with subsection (f)(2) does not automatically require remand. Rather, when the ALJ fails to discuss the factors in subsection (c), or explain how other evidence contradicts the treating physician's opinion, that requires the Commissioner's attorneys and the Court to conduct a "searching review of the record," Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam), and figure out if there is a convincing justification as a substantive matter for not giving the treating physician's opinion controlling or substantial weight. See Estrella, 925 F.3d at 96. Having conducted that review here, my conclusion is that the procedural error – the lack of discussion of the subsection (c) factors or other record evidence that undermined Dr. Andrianova's opinions – did not lead to a failure to comply with the substance of the treating physician rule. I reach that conclusion for two reasons.

8. First, the ALJ's characterization of his treatment of Dr. Andrianova's opinions – that he was giving them "little weight" – was an overstatement. My review indicates that he gave those opinions quite a bit of weight. This is apparent from a comparison of the limitations that Dr. Andrianova found with those that the ALJ placed on plaintiff's RFC:

3

| Dr. Andrianova | ALJ |
|---|---|
| In an eight-hour workday, plaintiff can sit 5 hours, stand 1 hour, and walk 1 hour | In an eight-hour workday, plaintiff can sit 6 hours and stand or walk two hours |
| Plaintiff can sit up to 30 minutes, stand up to 15 minutes, and walk up to five minutes, and would need a five minute break every 30 minutes | [No restriction] |
| Plaintiff can walk up to 200 feet | [No restriction] |
| Plaintiff can carry 10 lbs. occasionally | No lifting or carrying more than 10 lbs. |
| Plaintiff has no dizziness or drowsiness, but cannot balance, and only occasionally stoop, kneel, or crawl | Plaintiff must avoid heights and machinery, and can only occasionally climb, squat, stoop, kneel, crouch, or crawl |
| Plaintiff would be absent from work once or twice per month | [No restriction] |
| [No restriction] | No concentrated exposure to fumes and no driving |
| [No restriction] | low stress work involving only occasional decision-making and changes in the work setting |

As can be seen, Dr. Andrianova's opinions were not entirely at odds with the ALJ's decision, and in some ways, the ALJ required a more protective work environment for plaintiff than did Dr. Andrianova.

9. The main difference that could be material to an RFC analysis is only that Dr. Andrianova saw plaintiff as needing a five-minute break every 30 minutes. That might well make it impossible for him to perform a sedentary job, and, in any event, the vocational expert was not asked to identify jobs that would accommodate that restriction. However, plaintiff offers no argument as to what impairment or combination of impairments could have led Dr. Andrianova to reach this conclusion (and Dr. Andrianova did not offer any).

10. Having reviewed plaintiff's impairments myself, the only one that appears anywhere in Dr. Andrianova's records that seems a possible explanation for this restriction is back pain. This raises the question of whether her opinion on the need for a 5 minute break for

4

every 30 minutes of sitting is supported by her treatment notes, or whether there is other evidence in the record that supports or undermines her view on that issue.

11.     The treatment notes tell a different story than Dr. Andrianova's opinion. She saw plaintiff every 3-5 weeks from the end of December 2016 through October 2017, and then once more on June 6, 2018. In the first four months of his visits, she not only failed to note any back or musculoskeletal problems, but affirmatively disclaimed such ailments: "No back pain or joints pain. No weakness or numbness." That finding repeats in each of her treatment notes through March 17, 2017, occasionally in slightly different language, *e.g.*, "normal curvature, no tenderness" or "no back pain, no numbness to limb, no other complaints."

12.     On April 10, 2017, this reporting changed. The April 10th treatment note noted significant (although not extreme) back pain – "++back pain[1] or lt hip pain," although still reporting "no weakness or numbness." On April 26, 2017, Dr. Andrianova noted "chronic back pain," and from that point on, the same notation appears in each of the treatment notes through October 2017; by August, Dr. Andrianova was even diagnosing plaintiff with a "h/o [history of] chronic back pain." But as to the April 10th and April 26th treatment notes, where the back pain notations begin, there is no identification of any event that changed plaintiff's musculoskeletal reporting in the three weeks between March 17 and April 10.

13.     Dr. Andrianova's notes suggest that plaintiff explained the pain was the result of his having been struck by a car ten years earlier; state that there was "[n]o recent injury"; and do not account for why plaintiff suddenly developed back pain in the three weeks since she had last seen him when he had indicated no back pain. Although there are varying definitions of the word "chronic" as applied to different ailments, see Stephanie Bernell & Steven W. Howard, Use

---

[1] Two "+" signs before a medical finding means "significant." Three "+" signs means extreme.

5

<u>Your Words Carefully: What is a Chronic Disease?</u>, 4 Frontiers in Pub. Health 159 (Nat'l Ctr. for Biotech. Info., 2016),[2] I don't see how back pain could become "chronic" over the two-week period between April 10th and April 26th. And her diagnosis of "chronic" back pain is even harder to fathom because she gave him a "good" prognosis of recovering from it.

14. Then there is the peculiar, final appointment seven months later with Dr. Andrianova on June 6, 2018. She noted, among other things, that plaintiff was "here for f/u [follow up] for seizures." As in the early days of her treatment of him, she noted "No back pain or joints pain. No weakness or numbness." How, then, could she have opined more than a year earlier that he had "significant" and "chronic" back pain?

15. The relevant dates in this case most likely explain the sudden emergence of plaintiff's back complaint in April of 2017. Plaintiff filed his application for disability benefits on November 4, 2016. He began seeing Dr. Andrianova about one month after that – obtaining her affirmative findings of "no back pain" for the nearly four-month period referenced above. But the April 26th treatment notes contain another interesting notation – plaintiff was "[h]ere for paperwork for durability [sic] [due] to chronic back pain. [I]bruprofen not working." It seems clear that "durability" should have transcribed as "disability." This "paperwork for durability" could only refer to Dr. Andrianova's medical source statement of the same date, the one that opined, *inter alia*, that plaintiff would need a five minute break every 30 minutes.

16. Thus, after four months of no musculoskeletal problems, plaintiff suddenly and inexplicably developed chronic back pain over a three-week period, just before he obtained a medical source statement that he could submit to support his benefits application. When one

---

[2] Also at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4969287/#:~:text=According%20to%20Wikipedia%20a%20chronic,for%20more%20than%20three%20months.

6

adds in the fact that 14 months later, plaintiff had gone from "significant" and "chronic" back pain with a "good" prognosis to "no back pain or joints pain," the inference of what is going on here is hard to avoid.[3]

17. This conclusion is further supported by Dr. Andrianova's response to plaintiff's regular reports beginning in April of "significant" back pain. There is a limited number of steps that physicians take to diagnose back pain – principally physical examination, x-rays, MRIs, CT-scans, and nerve damage testing – and about the same number of treatment modes – principally over-the-counter pain medication, physical therapy, prescription pain medication, corticosteroid injections, and consideration of various surgeries. Of the diagnostic techniques, Dr. Andrianova sent plaintiff only for a spinal x-ray.[4] Plaintiff complains that the ALJ referred to this x-ray too dismissively as "essentially normal," so here are the actual findings from the radiologist's two reports: "Bones and disc spaces normal. No fracture. Minimal scoliosis. No spondylolisthesis. Small chronic Schmorl's node, upper lumbar and lower thoracic spine. No fracture. Disc heights preserved. Normal alignment. No [illegible] defect."[5] That seems essentially normal to me.

18. Dr. Andrianova did not follow this up with an MRI or CT-scan. The only treatment that plaintiff had was NSAIDs and physical therapy. It is therefore plain that Dr.

---

[3] Cf. 20 C.F.R. § 404.1527(a)(2) ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.").

[4] Although a couple of Dr. Andrianova's treatment notes referenced mild left hip pain or bursitis, she never referred him for a pelvic or hip x-ray.

[5] Plaintiff has not advised me of what a "small Schmorl's node" is, and thus I cannot consider it significant enough to support Dr. Andrianova's proposed restriction.

Andrianova diagnosed plaintiff with "significant back pain" based solely on his self-reporting.[6] That is not sufficient to sustain an opinion that plaintiff would need a 5-minute break every 30 minutes.

19. Plaintiff's next, related argument is that the ALJ inadequately accounted for his seizure disorder. He presents this as a further reason that the ALJ did not give Dr. Andrianova's opinions sufficient weight or explain why he did not. Plaintiff notes that the ALJ did not even mention Dr. Andrianova's treatment of his seizure disorder. And unlike the severity of plaintiff's alleged back pain, there is no question that plaintiff, in fact, manifested numerous episodes of what at least looks like seizure. He was hospitalized six times for it in 2017 alone. Some of these seizures were minor or transient, lasting a few seconds, but some had a significant duration or manifested serially.

20. Plaintiff does not identify which of Dr. Andrianova's opinions were supposedly based on his history of manifesting seizure-like symptoms. Dr. Andrianova did not either – in fact, her response in her medical source statement, when asked what she was treating him for, was limited to "chronic back pain, stiffness, left hip pain due to bursitis." Most likely, it is the dynamic restrictions on which she opined, but as shown above, the ALJ required substantially the same restrictions and there were still jobs available in the national economy, so the ALJ's decision cannot be criticized in that regard.

21. Conceivably, plaintiff's argument relates to Dr. Andrianova's conclusion that he would miss 1-2 days of work per month. If so, nothing in her treatment notes or the record supports that conclusion. The frequency and severity of plaintiff's seizure symptoms does not

---

[6] Dr. Andrianova referred plaintiff to a pain specialist, Dr. Daniel J. Kohane. Dr. Kohane also accepted plaintiff's self-reporting of pain and based his diagnoses on that self-reporting. He recommended that plaintiff have an MRI of his spine, but nothing in the record suggests that plaintiff complied with that suggestion, nor did he schedule any other appointments with Dr. Kohane.

8

suggest that he would be out of work 1–2 days per month, as Dr. Andrianova opined, even if that could be material to his RFC.

22. In addition, it must be noted that plaintiff's episodes of seizure may not be epileptic or of other physical origin. Although plaintiff criticizes the ALJ's citation to normal EEG results – because seizures often register on an EEG only while they are occurring – the ALJ's reference was likely, at worst, immaterial. Most of the professionals who examined plaintiff for seizures, including Dr. Andrianova, noted that they couldn't tell if they were seizures or what are referred to as "pseudo-seizures", also known as psychogenic nonepileptic seizures (PNES). These are events that occur because of psychological impairments, most often a reaction to extreme stress. Pseudo-seizures would be consistent with the fact that a number of plaintiff's reported seizures occurred following, or in connection with, an asthma or panic attack. Having pseudo-seizures does not necessarily mean that plaintiff is malingering (although one medical professional raised that possibility). But the diagnoses are not consistent. Some of the providers outright decided that plaintiff was having pseudo-seizures, not seizures; others listed the diagnosis as "seizure vs. pseudo-seizure." On one occasion, the health care professional referred to it as a "conversion disorder."

23. That leads to what may be the strongest argument plaintiff makes – the ALJ did not adequately consider whether plaintiff's bipolar disorder and schizophrenia makes it impossible or unreasonably difficult for him to comply with his anti-seizure medication regime. If it does, then it would be hard to support the ALJ's minimization of the seizure disorder based on its amenability to medication.

24. It is clear that the ALJ was correct that plaintiff has bipolar disorder and schizophrenia. It is also clear that plaintiff has self-destructive tendencies. He has a family

history of lung cancer but has smoked 2–3 packs of cigarettes every day since he was 13 years old plus marijuana 2–3 times a day. He frequently goes off his medication, and on at least one occasion, he intentionally overdosed on his seizure medication. In addition, either deliberately or by reason of his mental impairments, plaintiff is a very unreliable reporter, having told numerous health care professionals, among other contradictions, that he does not have a substance abuse problem while admitting his marijuana use to others.

25. The ALJ viewed plaintiff's tendency to dissemble and not comply with his medication as further circumstantial evidence of his non-disability, but I think plaintiff raises a good point in this proceeding that perhaps that is due to his mental impairments, and therefore weighs in favor of a finding of disability if plaintiff is unable to attend to his medical condition. However, the problem with the argument is that there is no support for it in any of the psychological evaluations. Plaintiff has the burden of presenting evidence about the medical conditions that render him incapable of performing substantial gainful activity. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require claimant, who is in a better position to provide information about his own medical condition, to do so"). With all of the numerous doctor's appointments, hospitalizations, differential diagnoses, proposed treatments and follow-up recommendations (many of which plaintiff did not pursue), no medical professional ever suggested a mental inability to stay on his medication. In addition, although plaintiff had instances of non-compliance, he takes quite a bit of medication most of the time without incident. Thus, the ALJ was no more able to find a psychological inability to comply than am I. It would just be a guess.

26. It seems clear that plaintiff is capable of volitional action when it comes to obtaining benefits. First, I have noted above the sudden appearance of his back problems from

out of nowhere as his disability benefits application proceeded. Second, his last visit to Dr. Andrianova, some seven months after his prior visit, was, like his April 26, 2017 visit, purpose-driven, and I do not think the purpose was to obtain medical treatment.[7] Dr. Andrianova's treatment note from that date, partially quoted above, also states that

> Patient is 30 yo male here for f/u for seizures. Has forms-application for home care. Was evaluated by neurology – all workup[s] negative, suspected pseudoseizures. Patient informed that home care form would not be signed due to no medical necessity. Fianc[ée] was providing home care. Fianc[ée] called office – was verbally abusive, demanding that papers would be signed.

And, as noted above, Dr. Andrianova returned to her "No back pain or joints pain. No weakness or numbness."

27. The record would not support a finding that plaintiff's seizures or pseudo-seizures preclude him from performing sedentary work, as long as he works in a low-stress environment. The ALJ recognized that and conditioned his RFC conclusion upon it. The ALJ accurately summarized the occurrence of seizure and the various diagnoses surrounding it, and accommodated plaintiff's impairment in his hypothetical to the vocational expert.

28. Finally, plaintiff objects that the ALJ restricted him from "concentrated exposure to fumes," but that the opinion of the consulting physician, Dr. Kanista Basnayake, to which the ALJ gave "great weight," recommended that plaintiff avoid "smoke, dust and known respiratory irritants." Similarly, plaintiff points out that Dr. Basnayake recommended avoiding activities requiring fine visual acuity. As to the latter, the ALJ offered a perfectly reasonable explanation for not restricting visual activity – plaintiff had cataract surgery shortly before Dr. Basnayake's

---

[7] The Commissioner asserts that plaintiff was not seeing Dr. Andrianova for seizures. Apparently, this is based on the fact that plaintiff originally saw her to get clearance for cataract surgery. Her initial intake form notes "seizure control with [K]eppra, followed by neurology" as part of his history, but it does not appear that she made any referrals or treated him for seizure beyond what his prior neurologist had prescribed. Her diagnoses over the term of their relationship consisted of nicotine dependence, seizure, back pain, chronic back pain with radiation to legs, trochanteric bursitis in his left hip, erectile dysfunction, acute urinary tract infection, and cataract. Nevertheless, when she filled out her medical source statement, the only condition she referenced was back pain.

11

examination, and the subsequent reports almost all showed it had fully restored his vision. (In fact, Dr. Andrianova's medical source statement, and her treatment notes, either said nothing about any vision problem or reported that vision was normal.) As to the respiratory restrictions that the ALJ implemented, there is no reason that the ALJ had to use exactly the same language as Dr. Basnayake's proposed restriction. That is especially true since plaintiff's pulmonary examinations were normal, despite his extreme smoking habit.

29. If anything, the ALJ gave plaintiff the benefit of the doubt with respect to the work restrictions afforded him. For example, the ALJ might well have rejected any of the dynamic restrictions that he imposed based on Dr. Basnayake's conclusions and the peculiarity of Dr. Andrianova's musculoskeletal analysis.

30. I therefore conclude that any procedural error that the ALJ committed was harmless; that he did not substantively violate the treating physician rule; and that his decision was based on substantial evidence. Plaintiff's motion for judgment on the pleadings is therefore denied and the Commissioner's cross-motion for judgment on the pleadings is granted. The Clerk is directed to enter judgment, dismissing the case.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
March 5, 2021